## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| GULF RESTORATION NETWORK, SIERRA CLUB, and CENTER FOR BIOLOGICAL DIVERSITY, | No. |
| | Hon. |
| Plaintiffs, | |
| v. | |
| NATIONAL MARINE FISHERIES SERVICE and U.S. FISH AND WILDLIFE SERVICE, | |
| Defendants. | |

## PLAINTIFFS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### Introduction

1.      Plaintiffs Gulf Restoration Network, Sierra Club, and Center for Biological Diversity bring this suit to remedy the National Marine Fisheries Service's ("Fisheries Service") and U.S. Fish and Wildlife Service's ("FWS") (collectively, "the Services") unreasonable delay in completing consultation and issuing a biological opinion, as required by the Endangered Species Act ("ESA"), on federally authorized oil and gas operations in the Gulf of Mexico. Specifically, the Fisheries Service and FWS have unreasonably delayed completion of ESA consultation on the effects on threatened and endangered species from the Bureau of Ocean Energy Management's ("BOEM") and Bureau of Safety and Environmental Enforcement's ("BSEE") (collectively, "the Bureaus") oil and gas leasing program and associated actions under the Outer Continental Shelf Lands Act ("OCSLA") in the Gulf of Mexico.

2.      The Gulf of Mexico is home to over two dozen species that are listed as either threatened or endangered under the ESA, as well as an incredibly diverse and productive array of wildlife and ecosystems.  The Gulf also is the epicenter of the nation's offshore oil and gas

industry, with tens of thousands of active wells, thousands of production platforms, tens of

thousands of miles of underwater pipelines, and countless support and exploration vessel trips.

3.     Those oil and gas operations adversely affect threatened and endangered species

in the Gulf, as well as the broader Gulf of Mexico ecosystem, in a variety of ways on a daily

basis.  Those effects sometimes are catastrophic, as when the Deepwater Horizon oil drilling rig

exploded on April 20, 2010.  The disaster killed 11 crew members and caused 206 million

gallons of oil to spew from the ground for 87 days, spreading throughout the Gulf of Mexico and

coating wildlife and ecosystems.  The spill killed countless marine mammals, sea turtles,

shorebirds, and other wildlife.  Scientists continue to discover new harmful effects of the spill to

this day.

4.     The ESA requires each federal agency, in consultation with the relevant federal

wildlife service, to insure that its actions are not likely to jeopardize the continued existence of

any threatened or endangered species or destroy or adversely modify the critical habitat of any

such species.  The consultation process is a central feature of the ESA's framework for

protecting endangered and threatened species.

5.     In 2007, the Minerals Management Service ("MMS") — the Bureaus'

predecessor[1] — consulted with the Fisheries Service on the effects of Gulf of Mexico oil and gas

leasing and operations on ESA-listed species.  Although the Fisheries Service concluded the

activities would not likely jeopardize any species, it determined the activities would kill or

---

[1] MMS was renamed the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE") in 2010, in the wake of the Deepwater Horizon disaster.  *See* 75 Fed. Reg. 61,051 (Oct. 4, 2010).  In late 2011, the agency was again reorganized into BOEM (which manages development of offshore resources) and BSEE (which oversees safety and environmental regulation of offshore development).  *See* 76 Fed. Reg. 64,432 (Oct. 18, 2011).

significantly harm hundreds of threatened and endangered sea turtles, as well as several endangered sperm whales and several threatened Gulf sturgeon.

6.      In the wake of the Deepwater Horizon disaster, BOEMRE and the Fisheries Service called into question whether the analyses in their 2007 consultation were correct. BOEMRE accordingly asked the Fisheries Service and FWS to reinitiate ESA consultation on July 30, 2010.  The Services agreed.

7.      It is now nearly eight years later, and the Fisheries Service and FWS have not completed consultation; this despite the Fisheries Service's earlier assurance to a federal court that consultation would be completed by October 31, 2014.  In the meantime, the Bureaus continue to authorize hundreds of oil and gas exploration, development, and production activities in the Gulf of Mexico each year, in reliance on the outdated 2007 consultation.

8.      Plaintiffs therefore ask this Court to declare that the Fisheries Service and FWS have unreasonably delayed completion of the 2010 reinitiated ESA consultation, in violation of the Administrative Procedure Act ("APA"), and to order the Fisheries Service and FWS to complete said overdue consultation within 90 days.

**Jurisdiction and Venue**

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1333 (federal question) and 5 U.S.C. § 704 (APA).

10.      Venue properly vests in this District pursuant to 28 U.S.C. § 1391(b) and (e)(i) because a substantial part of the events and omissions which gave rise to this action occurred in this District.  Venue is proper in this Division pursuant to Local Rule 1.02 because a substantial part of the events and omissions which gave rise to this action occurred in Pinellas County, Florida.

11.     This Court has authority to grant Plaintiffs' requested relief pursuant to the APA, 5 U.S.C. § 706(1), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

12.     Defendants' sovereign immunity has been waived under the APA.  5 U.S.C. § 702.

## Parties

13.     Plaintiff GULF RESTORATION NETWORK ("GRN") is a nonprofit network of community, conservation, environmental, and fishing groups and individuals committed to empowering people to protect and restore the natural resources of the Gulf of Mexico.  GRN is headquartered in New Orleans, Louisiana, with offices in Pensacola, Florida, and Jackson, Mississippi.  GRN's members live in the five Gulf states of Texas, Louisiana, Mississippi, Alabama, and Florida, and nationwide.  Over 3,300 of GRN's registered supporters reside in Florida.

14.     Plaintiff SIERRA CLUB is a not-for-profit organization dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.  Sierra Club is one of the oldest and largest conservation groups in the country, with about 800,000 members nationally in 64 chapters in all of the 50 states, the District of Columbia, and Puerto Rico.  Approximately 85,000 members of the Sierra Club are residents of the Gulf States, including over 37,000 members in Florida.  Sierra Club members use the public lands and waters throughout the Gulf — including those that would be affected by oil and gas activities — for quiet recreation, aesthetic pursuits, and spiritual renewal.  Sierra Club brings this action for itself and as representative of its members in the State of Florida.

15.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("Center") is a nonprofit corporation that maintains offices across the country, including:  Washington, D.C.; California; Arizona; St. Petersburg, Florida; New York; Oregon; Washington; and Baja California Sur, Mexico.  The Center advocates for the protection of threatened and endangered species and their habitats through science, policy, and environmental law.  The Center's mission also includes protecting air quality, water quality, and public health.  The Center's Oceans Program focuses specifically on conserving marine ecosystems, and seeks to ensure that imperiled species such as marine mammals, corals, and sea turtles are properly protected from destructive practices in our oceans.  The Oceans Program also works to protect coastal communities from the air pollution, water pollution, and other impacts that result from such practices.  In pursuit of this mission, the Center has been actively involved in protecting the Gulf of Mexico from the harmful impacts of offshore oil and gas drilling.  The Center has more than 63,000 members, including members who live and recreate in Florida and throughout the Gulf of Mexico region.  The Center brings this action on behalf of itself and its members.

16.     Plaintiffs and Plaintiffs' members and constituents regularly use, enjoy, and benefit from the marine environment of the Gulf of Mexico, including U.S. waters within the Middle District of Florida and beyond.  Plaintiffs and Plaintiffs' members and constituents also regularly use, enjoy, and benefit from the presence of healthy marine life — including threatened and endangered species — within that environment for recreational, aesthetic, commercial, scientific, and environmental purposes, such as whale watching, scientific study, boat touring, underwater diving, fishing, and photography.  The ability of Plaintiffs and Plaintiffs' members to pursue these interests hinges not only on the well-being of threatened and endangered species

that live, migrate, feed, and breed in areas affected by oil and gas activities, but also on the health of the marine ecosystem on which these species depend.

17.     The Fisheries Service's and FWS's failures to comply with the ESA and APA have caused and are causing Plaintiffs' members and staff procedural harms connected to their substantive conservation, recreational, scientific, and aesthetic interests.  Plaintiffs' members and staff rely on the Fisheries Service and FWS to comply with the requirements of the ESA to guide the Bureaus' authorization of Gulf oil and gas activities so as to protect endangered and threatened species from harmful effects of those activities.  Because the Bureaus continue to authorize Gulf oil and gas activities in the absence of completed consultation and a current biological opinion, the interests of Plaintiffs and Plaintiffs' members have been, are being, and will be adversely affected by the Fisheries Service's and FWS's violations of federal law, as described herein.

18.     These harms can only be remedied if the Fisheries Service and FWS are ordered to comply with the ESA.  Plaintiffs have no other adequate remedy at law.

19.     Defendant NATIONAL MARINE FISHERIES SERVICE is the federal agency within the U.S. Department of Commerce's National Oceanic and Atmospheric Administration with responsibility for administering and implementing the ESA with respect to marine species. Specifically, the Fisheries Service has responsibility under the ESA for sea turtles (while they are in the water), whales, sharks, rays, corals, and marine fish (including grouper, sawfish, and Gulf sturgeon).

20.     Defendant UNITED STATES FISH AND WILDLIFE SERVICE is the federal agency within the U.S. Department of the Interior with responsibility for administering and implementing the ESA with respect to terrestrial and freshwater species, as well as certain

coastal species. Specifically, FWS has responsibility under the ESA for sea turtles (while they are on land), birds, and manatees.

**Statutory Background**

**I.    Outer Continental Shelf Lands Act**

21.    OCSLA governs the leasing, exploration, and development of oil and gas deposits in the Outer Continental Shelf. 43 U.S.C. § 1331 *et seq.* The Outer Continental Shelf extends from the outer boundary of state waters — typically three miles from shore — to the outer boundary of the United States' Exclusive Economic Zone, 200 nautical miles from shore. *Id.* §§ 1301(a)(2), 1331(a); 48 Fed. Reg. 10,605 (Mar 14, 1983).

22.    BOEM is the federal agency within the Department of the Interior that manages these activities under OCSLA. 30 C.F.R. § 550.101. BSEE, also within the Department of the Interior, is the federal agency responsible for enforcing safety and environmental standards for offshore oil and gas activities and approving some activities. *Id.* § 250.101.

23.    OCSLA prescribes four stages for BOEM to lease and allow development of oil and gas deposits in the Outer Continental Shelf: 1) five-year leasing programs; 2) lease sales; 3) exploration plans; and 4) development and production plans. 43 U.S.C. §§ 1337, 1340, 1344, 1351.

24.    At the five-year program stage, BOEM designates "the size, timing, and location of leasing activity" over an upcoming five-year period. *Id.* § 1344(a).

25.    At the lease sale stage, BOEM offers for sale leases that "entitle the lessee to explore, develop, and produce the oil and gas contained within the lease area," subject to certain additional approvals. *Id.* § 1337.

26.    Prior to commencing exploration on a lease, including geophysical surveys or exploratory drilling, lessees must submit an exploration plan to BOEM and receive the agency's

approval.  *Id.* § 1340.  BOEM also may authorize others to conduct geological and geophysical explorations in the Outer Continental Shelf that do not interfere with leases that have been issued or activities taken pursuant to a lease.  *Id.* § 1340(a)(1).

27.     Prior to commencing production or development on a lease in the Gulf of Mexico, lessees must submit a Development Operations Coordination Document to BOEM and receive the agency's approval.  30 C.F.R. § 550.201; *see* 43 U.S.C. § 1351.

28.     Lessees must obtain approval from BSEE before they may drill, install production safety systems, install or perform major modifications to platforms or other structures, or install lease-term pipelines under their leases.  30 C.F.R. § 550.281.

## II.    Endangered Species Act

29.     Congress enacted the ESA to protect endangered and threatened species and the ecosystems on which those species depend.  16 U.S.C. § 1531(b).  Through the ESA, Congress declared its policy "that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of [the Act]."  *Id.* § 1531(c)(1).

30.     The ESA provides protection to those species either of the Services designates as either "endangered" or "threatened."  A species is endangered when it "is in danger of extinction throughout all or a significant portion of its range."  *Id.* § 1532(6).  A species is threatened if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  *Id.* § 1532(20).

31.     If either of the Services lists a species as threatened or endangered, it must designate critical habitat for that species.  *Id.* § 1533(a)(3)(A)(i).  Critical habitat includes areas occupied by the species containing "physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or

protection," and areas not occupied by the species that "are essential for the conservation of the species." *Id.* § 1532(5)(A).  Conservation means "the use of all methods and procedures which are necessary" to recover species to the point that they no longer need ESA protection.  *Id.* § 1532(3).

32.     Section 7(a)(2) of the ESA requires each federal agency to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species."  *Id.* § 1536(a)(2).  An "action" includes "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies" — including "the granting of . . . leases [and] permits" — that are within the agencies' discretionary control.  50 C.F.R. §§ 402.02, 402.03.

33.     The ESA and its implementing regulations establish an interagency consultation process to assist federal agencies in complying with this duty.  An agency must consult with the appropriate Service — either FWS, the Fisheries Service, or, as here, both — under section 7 whenever it takes an action that "may affect" a threatened or endangered species or critical habitat.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).  In addition, an agency must confer with the appropriate Service "on any agency action which is likely to jeopardize the continued existence of any species proposed to be listed under [ESA section 4] or result in the destruction or adverse modification of critical habitat proposed to be designated for such species." 16 U.S.C. § 1536(a)(4); *see also* 50 C.F.R. § 402.10.

34.     The agency must consider all possible effects across the "action area," which encompasses "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action."  50 C.F.R. § 402.02.  The "effects of the action" that

must be considered include "the direct and indirect effects of an action on the species or critical

habitat, together with the effects of other activities that are interrelated or interdependent with

that action." *Id.* "Indirect effects are those that are caused by the proposed action and are later

in time, but still are reasonably certain to occur." *Id.* "Interrelated actions are those that are part

of a larger action and depend on the larger action for their justification." *Id.* "Interdependent

actions are those that have no independent utility apart from the action under consideration." *Id.*

35.     If the federal agency concludes the action may affect listed species or their critical

habitats, it must initiate formal consultation with the appropriate Service, unless the federal

agency determines and the Service concurs in writing that the action is "not likely to adversely

affect" any listed species or critical habitat.  50 C.F.R. §§ 402.13(a), 402.14(a), (b)(1).

36.     Formal consultation commences when a federal agency submits a written request

to the appropriate Service, which may include a biological assessment that evaluates the potential

effects of the action on listed species and critical habitats.  *Id.* §§ 402.02, 402.12(a), 402.14(c).

37.     Commencement of formal consultation triggers several responsibilities for the

appropriate Service, including reviewing all relevant information, and evaluating the status of

affected species and critical habitats and the extent to which they will be affected by the action.

*Id.* § 402.14(g).

38.     Formal consultation must conclude within 90 days after its initiation unless the

appropriate Service and federal agency mutually agree on a different time period.  16 U.S.C.

§ 1536(b)(1)(A); *see also* 50 C.F.R. § 402.14(e).

39.     The ESA requires the appropriate Service to deliver to the federal agency a

biological opinion evaluating the effects of the federal action on listed species and their critical

habitats "promptly" after the conclusion of formal consultation.  16 U.S.C. § 1536(b)(3)(A); *see also* 50 C.F.R. § 402.14(e), (h).

40.     If the appropriate Service concludes that the proposed action is likely to jeopardize a listed species or result in adverse modification of its critical habitat, it must propose reasonable and prudent alternatives, if available, that will mitigate the proposed action so as to avoid jeopardy and adverse modification of critical habitat.  16 U.S.C. § 1536(b)(3); 50 C.F.R. §§ 402.02, 402.14(h)(3).

41.     If the appropriate Service concludes that the proposed action will incidentally take a listed species, but will not jeopardize the species' continued existence, it must include with the biological opinion an "incidental take statement" that specifies the amount of take anticipated and the measures required to limit take.  50 C.F.R. § 402.14(i)(1).  "Take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  The federal agency must reinitiate consultation with the appropriate Service immediately if, among other things, the anticipated amount of take is exceeded during the course of the action.  50 C.F.R. § 402.14(i)(4).

42.     Consultation concludes under one of only three circumstances:

(1) Formal consultation is terminated with the issuance of the biological opinion.

(2) If during any stage of consultation a Federal agency determines that its proposed action is not likely to occur, the consultation may be terminated by written notice to the Service.

(3) If during any stage of consultation a Federal agency determines, with the concurrence of the Director, that its proposed action is not likely to adversely affect any listed species or critical habitat, the consultation is terminated.

*Id.* § 402.14(l).

43.     The duty to consult is ongoing:

Reinitiation of formal consultation is required and shall be requested by the
Federal agency or by the Service, where discretionary Federal involvement or
control over the action has been retained or is authorized by law and:

> (a) If the amount or extent of taking specified in the incidental take
> statement is exceeded;

> (b) If new information reveals effects of the action that may affect listed
> species or critical habitat in a manner or to an extent not previously considered;

> (c) If the identified action is subsequently modified in a manner that
> causes an effect to the listed species or critical habitat that was not considered in
> the biological opinion; or

> (d) If a new species is listed or critical habitat designated that may be
> affected by the identified action.

*Id.* § 402.16.  So long as a federal agency has retained discretionary involvement or control over

an action, the occurrence of any of the four listed circumstances triggers an immediate duty for

the agency to enter into consultation with the appropriate Service.

44.     Compliance with the ESA's consultation process is integral to fulfilling the

statute's substantive objectives because it ensures federal agencies will not cause serious, undue

harm to threatened or endangered species or their critical habitats.

## III.     Administrative Procedure Act

45.     The APA directs an agency "to conclude a matter presented to it" "within a

reasonable time."  5 U.S.C. § 555(b).

46.     A reviewing court may compel action if the agency has a duty to act and it has

"unreasonably delayed" in discharging that duty.  *Id.* § 706(1).

### Statement of Facts

## I.     Threatened and Endangered Wildlife in the Gulf of Mexico

47.     The Gulf of Mexico is an extraordinary aesthetic, economic, and environmental

resource to the State of Florida, the other states along the Gulf Coast, and the nation, supporting

some of the most productive and biodiverse tropical and temperate ecosystems in the United States.

48.     The Gulf of Mexico is home to thousands of marine species, ranging from simple invertebrates, such as conchs and sponges, to complex and highly evolved fish and marine mammals.  It is estimated that the Gulf contains thousands of species of invertebrates, at least 600 species of fish, and 29 species of whales and dolphins.  In addition, five of the world's seven species of sea turtles, as well as tens of thousands of shore, coastal, and sea birds reside in or migrate to the Gulf of Mexico.  Over 300 species of coral, combined with other hard-bottom communities, wetlands, seagrass beds, mangroves, and soft-bottom communities, provide the necessary habitat to support this rich assemblage of marine life.  These diverse and highly complex habitats provide food, shelter, and spawning grounds for these species at different points during their life history.

49.     Many of the animals living in the Gulf of Mexico are listed as endangered or threatened under the ESA.

50.     Of the seven baleen whale species known to occur in the Gulf of Mexico, four are listed as endangered under the ESA:  the blue whale, finback whale, sei whale, and North Atlantic right whale.  A fifth — the Gulf of Mexico Bryde's whale — has been proposed for listing as an endangered subspecies.

51.     Other ESA-listed marine mammals present in the Gulf are the sperm whale (endangered) and the West Indian manatee (threatened).

52.     All five sea turtles found in the Gulf are listed as endangered or threatened under the ESA.  The Kemp's ridley sea turtle (the most endangered sea turtle in the world), hawksbill

sea turtle, and leatherback sea turtle population in the Gulf are listed as endangered, while the green sea turtle and loggerhead sea turtle populations in the Gulf are listed as threatened.

53.     The oceanic whitetip shark and the giant manta ray, both of which are found in the Gulf of Mexico, are listed as threatened under the ESA.

54.     Among the Gulf's fish species, the Gulf sturgeon and Nassau grouper are listed as threatened, and the smalltooth sawfish is listed as endangered under the ESA.  The dwarf seahorse is a candidate for listing under the ESA.

55.     Seven species of coral in the Gulf of Mexico are listed as threatened:  the rough cactus coral, pillar coral, lobed star coral, mountainous star coral, boulder star coral, staghorn coral, and elkhorn coral.

56.     The threatened piping plover and wood stork are found in the Gulf's coastal habitats.

57.     Additionally, critical habitat is designated in or along the Gulf of Mexico for six ESA-listed species:  the loggerhead sea turtle, Gulf sturgeon, smalltooth sawfish, elkhorn coral, staghorn coral, and piping plover.

58.     Of the species listed above, the Nassau grouper, oceanic whitetip shark, giant manta ray, rough cactus coral, pillar coral, lobed star coral, mountainous star coral, and boulder star coral have been added to the list of endangered or threatened species since 2007.  The green sea turtle, loggerhead sea turtle, and wood stork have been reclassified under the ESA since 2007.  In addition, piping plover critical habitat in the Gulf has been modified since 2007.

## II.     Previous ESA Consultation on Gulf of Mexico Oil and Gas Activities

59.     Oil and gas exploration, development, and production, along with their associated activities, have myriad adverse effects on threatened and endangered species and their habitats. These include, but are not limited to, vessel strikes, noise (from vessels, seismic surveys,

construction, and general operations), oil spills (both large and small), and marine debris and other water pollution from oil and gas vessels.

60.     Accordingly, lease sales and authorizations of associated activities under OCSLA may adversely affect ESA-listed species and thus require formal consultation under section 7 of the ESA.  This duty to comply with section 7 of the ESA applies at each of the four OCSLA stages.  *Vill. of False Pass v. Clark*, 733 F.2d 605, 609 (9th Cir. 1984); *accord Defs. of Wildlife v. Bureau of Ocean Energy Mgmt., Regulation, & Enf't*, 871 F. Supp. 2d 1312, 1328 (S.D. Ala. 2012).

61.     In recognition of this duty, MMS engaged in ESA consultations with the Fisheries Service in 2002 and 2006–2007 on Gulf of Mexico oil and gas activities on the Outer Continental Shelf.  The Fisheries Service produced a biological opinion at the conclusion of each consultation.

62.     The 2007 consultation and biological opinion covered effects on threatened and endangered species and their critical habitats from "the exploration, development and production, and associated activities as a result of MMS lease sales" that MMS planned to hold in the Gulf of Mexico during the 2007–2012 five-year period.

63.     The Fisheries Service evaluated the effects of these activities on the sperm whale, leatherback sea turtle, Kemp's ridley sea turtle, hawksbill sea turtle, green sea turtle, loggerhead sea turtle, Gulf sturgeon, and Gulf sturgeon critical habitat.

64.     The Fisheries Service concluded in its 2007 biological opinion that the proposed action would not jeopardize any listed species or adversely modify critical habitat.  However, the Fisheries Service did conclude that the proposed action likely would severely harm or kill several

sperm whales, several Gulf sturgeon, and hundreds of sea turtles.  The Fisheries Service did not issue an incidental take statement for such harm or mortality.

65.     The Fisheries Service required MMS to implement just two reasonable and prudent alternatives, both of which were aimed at minimizing the risk of lethal vessel strikes of sea turtles.

### III.     The Deepwater Horizon Explosion and Oil Spill

66.     On April 20, 2010, a series of human and mechanical failures culminated in an explosion that tore through the Deepwater Horizon oil drilling rig.  *See generally In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 21 F. Supp. 3d 657 (E.D. La. 2014).  The explosion caused the rig to sink and oil to gush from the seabed, nearly 5,000 feet below the surface, for months, until the well finally was capped in mid-July 2010.  The result was the largest oil spill in the history of the United States and a clean-up and containment effort that at its height enlisted 50,000 workers on land and sea.

67.     Over the 87 days during which the well remained uncapped, millions of barrels of oil and unquantified amounts of natural gas flowed freely into the Gulf.  In an effort to break apart large concentrations of oil, responders released 1 million gallons of toxic dispersants into Gulf waters.

68.     The spill contaminated over 112,000 $km^2$ of surface waters and over 2,100 km of shoreline in the Gulf.

69.     As the Department of Interior described:

[T]he Spill caused impacts to coastal and oceanic ecosystems ranging from the deep ocean floor, through the oceanic water column, to the highly productive coastal habitats of the northern Gulf, including estuaries, shorelines and coastal marshes.  Affected resources include ecologically, recreationally, and commercially important species and their habitats in the Gulf and along the coastal areas of Texas, Louisiana, Mississippi, Alabama, and Florida.  These fish

and wildlife species and their supporting habitats provide a number of important ecological and recreational use services.

U.S. Dep't of Interior, et al., *Deepwater Horizon Oil Spill Natural Resource Damage Assessment: Programmatic and Phase III Early Restoration Plan and Early Restoration Programmatic Environmental Impact Statement* Ch. 1, p. 1 (2014).

70.     Scientists estimate the spill caused death or serious harm to billions, if not trillions, of animals, including over 100,000 individuals of species listed as threatened or endangered.

71.     Thousands of marine mammals belonging to 15 species suffered losses. Deepwater Horizon Oil Spill Nat. Res. Trs., *Deepwater Horizon Oil Spill Final Programmatic Damage Assessment and Restoration Plan and Final Programmatic Environmental Impact Statement* 4-632 to -633 (2016), *available at* http://www.gulfspillrestoration.noaa.gov/restoration-planning/gulf-plan.  The spill was estimated to have caused up to a 7% decline in the endangered sperm whale population and up to a 22% decline in the Bryde's whale population (which is proposed to be listed as endangered).  *Id.* at 4-631.

72.     All five sea turtle populations in the Gulf suffered significant losses.  The spill was estimated to have killed between 38,100 and 90,100 endangered Kemp's ridley sea turtles, between 15,000 and 55,000 threatened green sea turtles, between 4,300 and 13,600 threatened loggerhead sea turtles, between 600 and 3,000 endangered hawksbill sea turtles, and an undetermined number of endangered leatherback sea turtles; in addition to 35,000 sea turtle hatchlings and between 1,930 and 4,790 sea turtles of undetermined species.  *Id.* 4-571 to -573.

73.     The spill also was estimated to have harmed or killed 1,100 to 3,600 threatened

Gulf sturgeon, *id.* at 4-414, and killed tens of millions to billions of other fish species, *id.* at

4-208.

74.     The spill caused severe harm to deepwater corals, which scientists estimate could

take decades to recover from.  *Id.* at 4-253, 4-268, 4-274.

75.     Scientists estimated that between 56,100 and 102,400 individual coastal and

marine birds of at least 93 species — including the threatened piping plover — were lost.  *Id.* at

4-493.

76.     The harm from the spill to marine and coastal species and the environment

persists to this day.

## IV.     Reinitiation of ESA Consultation on Gulf of Mexico Oil and Gas Activities

77.     On July 30, 2010, BOEMRE requested that the Fisheries Service and FWS

reinitiate the ESA consultation on federally authorized Gulf of Mexico oil and gas activities

under OCSLA, in light of new information from the Deepwater Horizon disaster.  BOEMRE

explained that the spill called into question the assumptions behind the analyses in previous

consultations of potential oil spill effects and may have affected the status of ESA-listed species

and critical habitats.

78.     In September 2010, the Fisheries Service and FWS submitted letters to BOEMRE

agreeing that reinitiation was warranted.  The Fisheries Service noted, "it is clear that we have

underestimated the size, frequency, and impacts associated with a catastrophic spill."  FWS

stated that the "incident and resulting oil spill represent new information regarding potential

adverse effects to endangered and threatened species," and acknowledged that "the status of

some listed species or designated critical habitats may have been altered."

79.     Following the October 2011 reorganization of BOEMRE, both Bureaus —
BOEM and BSEE — took over jointly as the federal action agencies in the consultation process.

80.     The Bureaus produced a draft biological assessment for the reinitiated
consultation on April 24, 2012.

81.     On June 18, 2012, four conservation groups — including the Center — filed a
lawsuit in the U.S. District Court for the District of Columbia challenging BOEM's approval of
two lease sales in the Gulf of Mexico.  *Oceana v. Bureau of Ocean Energy Mgmt.*, No. 1:12-cv-
00981-RC (D.D.C. filed June 18, 2012).  The groups amended the complaint on October 1, 2012,
to add a claim against the Fisheries Service for unreasonably delaying completion of the
reinitiated consultation.

82.     The Bureaus transmitted a final biological assessment for the reinitiated
consultation to the Fisheries Service on February 7, 2013.

83.     The Bureaus also transmitted a final biological assessment for the reinitiated
consultation to FWS in early 2013.

84.     On March 29, 2013, the Fisheries Service sent the Bureaus a letter acknowledging
receipt of the biological assessment and identifying additional information and analyses
necessary to complete consultation.

85.     On May 31, 2013, the Fisheries Service determined the biological assessment was
complete and initiated formal consultation.

86.     The formal consultation with the Fisheries Service has been overseen by the
Assistant Regional Administrator for the Protected Resources Division in the Fisheries Service's
Southeast Regional Office, located in St. Petersburg, Florida.

87.     On information and belief, FWS also determined the biological assessment was complete and initiated formal consultation in early 2013.

88.     On June 18, 2013, the Fisheries Service proposed to the Bureaus a timeline in which consultation would be completed and biological opinion finalized by October 23, 2014.

89.     On August 9, 2013, the Bureaus sent a letter to the Fisheries Service agreeing that the October 2014 target date "is a reasonable timeframe for completion of this ESA Section 7 consultation."  The Bureaus noted that the target completion date could change, but not "by more than a few weeks."

90.     On August 23, 2013, the Fisheries Service filed a sworn declaration of David Bernhart, Assistant Regional Administrator for the Protected Resources Division in the Southeast Regional Office of the Fisheries Service, with the district court in the *Oceana* case.  Mr. Bernhart stated in the declaration that "a final biological opinion can be produced by October 31, 2014." Mr. Bernhart explained that the October 31, 2014 completion date was "reasonable" based on the complexity of the consultation, Fisheries Service resources, and the interagency coordination process.

91.     On November 25, 2013, the Fisheries Service filed a second sworn declaration of Mr. Bernhart with the district court in which he explained that the Fisheries Service had to extend the projected date for completion of the biological opinion to November 18, 2014, as a result of a temporary staff furlough during a lapse in agency appropriations.

92.     On December 19, 2013, the Fisheries Service filed a notice with the district court that it could not complete consultation until March 18, 2015.

93.     On March 31, 2014, the district court issued an opinion and order in the *Oceana* case denying the plaintiffs' unreasonable delay claim.  *Oceana v. Bureau of Ocean Energy*

*Mgmt.*, 37 F. Supp. 3d 147, 187 (D.D.C. 2014). The court accepted the March 2015 target date as reasonable, but noted that "by the time [the Fisheries Service] produces its Biological Opinion in 2015, the Deepwater Horizon oil spill will be five years behind it." *Id.*

94.     It is now over seven years after the Bureaus reinitiated consultation with the Fisheries Service and FWS, over five years after the Fisheries Service and FWS received the Bureaus' final biological assessment, and over three years after the date by which the Fisheries Service told a federal court it would produce a final biological opinion.

95.     As of this date, the Fisheries Service has not completed the reinitiated consultation with the Bureaus on Gulf of Mexico oil and gas leasing and associated activities under OCSLA.

96.     As of this date, the Fisheries Service has not produced a final biological opinion on the reinitiated consultation with the Bureaus on Gulf of Mexico oil and gas leasing and associated activities under OCSLA.

97.     As of this date, FWS has not completed the reinitiated consultation with the Bureaus on Gulf of Mexico oil and gas leasing and associated activities under OCSLA.

98.     As of this date, FWS has not produced a final biological opinion on the reinitiated consultation with the Bureaus on Gulf of Mexico oil and gas leasing and associated activities under OCSLA

99.     In the meantime, BOEM continues to hold lease sales and authorize oil and gas exploration, development, and production activities in the Gulf of Mexico, and BSEE continues to approve drilling operations, in reliance on the outdated 2007 biological opinion.

100.     Since submitting a final biological assessment to the Fisheries Service on February 7, 2013, BOEM has released a new five-year leasing program and proposed another,

sold over 7 million acres of new leases through 13 lease sales in the Gulf of Mexico, and

approved over 2,500 exploration plans and Development Operations Coordination Documents in

the Gulf of Mexico.  During that same period, BSEE has approved nearly 5,000 applications for

permit to drill in the Gulf of Mexico.

101.    The Bureaus are taking these actions without the benefit of up-to-date direction

from the federal government's wildlife experts on how their actions may harm threatened and

endangered species and how they can avoid or minimize those effects.  Accordingly, the

Fisheries Service's and FWS's ongoing failures to complete consultation and issue a new

biological opinion are putting threatened and endangered species at risk of harm.  Further delay

will only compound those risks.

**Causes of Action**

## COUNT I – THE FISHERIES SERVICE HAS UNREASONABLY DELAYED COMPLETING CONSULTATION WITH THE BUREAUS AND ISSUING A BIOLOGICAL OPINION IN VIOLATION OF THE APA

102.    The allegations made in all preceding paragraphs are realleged and incorporated

by this reference.

103.    All decisions and actions taken by the Bureaus under OCSLA are agency actions

under the ESA.  *See* 16 U.S.C. § 1536(a)(2).  Issuing five-year leasing programs, conducting

lease sales pursuant to the leasing programs, approving lessees' exploration plans, approving

lessees' Development Operations Coordination Documents, and approving applications for

permits to drill are all agency "actions" that may affect threatened and endangered species and

critical habitats under ESA section 7(a)(2).  *See id.*

104.    ESA section 7(a)(2) requires the Bureaus to consult with the Fisheries Service to

insure their leasing programs, lease sales, approvals of exploration plans, approvals of

Development Operations Coordination Documents, and approvals of applications for permits to

22

drill in the Gulf of Mexico are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction of adverse modification of habitat of such species which is determined by [the Service] . . . to be critical." *See* 16 U.S.C. § 1536(a)(2); *see also* 50 C.F.R. § 402.14; *False Pass*, 733 F.2d at 609; *Defs. of Wildlife*, 871 F. Supp. 2d at 1328.

105.    Formal consultation "commences with the Federal agency's written request for consultation under section 7(a)(2) of the Act and concludes with [the Fisheries Service's] issuance of a biological opinion under section 7(b)(3) of the Act." 50 C.F.R. § 402.02; *see also id.* § 402.14(c).

106.    BOEMRE submitted a written request for formal consultation on its Gulf of Mexico oil and gas activities under OCSLA to the Fisheries Service on July 30, 2010.  The Bureaus submitted a final biological assessment to the Fisheries Service on February 7, 2013. Formal consultation between the Bureaus and the Fisheries Service therefore commenced on July 30, 2010, *see id.* § 402.02, or, in any event, no later than February 7, 2013, when the Bureaus submitted the biological assessment to the Fisheries Service, or May 31, 2013, when the Fisheries Service determined the biological assessment was complete, *see id.* § 402.14(c).

107.    The initiation of formal consultation requires the Fisheries Service to complete consultation and to deliver a biological opinion to the Bureaus upon the consultation's conclusion.  16 U.S.C. § 1536(b)(1)(A), (b)(3)(A); 50 C.F.R. § 402.14(e), (g), (l).

108.    The Fisheries Service has not issued a biological opinion on the reinitiated consultation.

109.    In addition, on information and belief, the Bureaus have not determined that their proposed actions are not likely to occur and have not determined, with the written concurrence of

the Fisheries Service, that their proposed actions are not likely to adversely affect any listed species or critical habitat.  The formal consultation commenced between the Bureaus and the Fisheries Service therefore has not concluded.  *See* 50 C.F.R. § 402.14(l).

110.    Under the APA, each federal agency must "conclude a matter presented to it" "within a reasonable time."  5 U.S.C. § 555(b).  The APA authorizes reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed."  *Id.* § 706(1).

111.    The schedule that Congress prescribed in the ESA for completing consultations informs the timeline for defining the APA duty to act within a reasonable time.  *See* 16 U.S.C. § 1536(b)(1)(A).

112.    The Fisheries Service previously represented to a federal court that October 23, 2014, would be a "reasonable" time by which to produce a final biological opinion on the Bureaus' proposed action.  The Fisheries Service subsequently informed the court it would complete the biological opinion by March 18, 2015.

113.    The Fisheries Service's multiple-year delay in completing the legally required reinitiated consultation on the Bureaus' OCSLA-related oil and gas activities in the Gulf of Mexico constitutes unreasonable delay under APA section 706(1) and a failure to conclude a matter presented to it within a reasonable amount of time under APA section 555(b).  5 U.S.C. §§ 555(b), 706(1).

114.    The Fisheries Service's multiple-year delay in publishing a legally required final biological opinion on the Bureaus' OCSLA-related oil and gas activities in the Gulf of Mexico constitutes unreasonable delay under APA section 706(1) and a failure to conclude a matter presented to it within a reasonable amount of time under APA section 555(b).  5 U.S.C. §§ 555(b), 706(1).

115.    The Fisheries Service's unlawful delay in completing this required consultation and publishing a biological opinion is resulting in and will continue to result in approvals of oil and gas activities in the Gulf of Mexico that have an elevated risk of harming or killing threatened and endangered species.  In light of the importance Congress has assigned to the protection of threatened and endangered species, the delay at issue in this case is manifestly unreasonable.

### COUNT II – FWS HAS UNREASONABLY DELAYED COMPLETING CONSULTATION WITH THE BUREAUS AND ISSUING A BIOLOGICAL OPINION IN VIOLATION OF THE APA

116.    The allegations made in all preceding paragraphs are realleged and incorporated by this reference.

117.    All decisions and actions taken by the Bureaus under OCSLA are agency actions under the ESA.  *See* 16 U.S.C. § 1536(a)(2).  Issuing five-year leasing programs, conducting lease sales pursuant to the leasing programs, approving lessees' exploration plans, approving lessees' Development Operations Coordination Documents, and approving applications for permits to drill each is an agency "action" that may affect threatened and endangered species and critical habitats under ESA section 7(a)(2).  *See id.*

118.    ESA section 7(a)(2) requires the Bureaus to consult with FWS to insure their leasing programs, lease sales, approvals of exploration plans, approvals of Development Operations Coordination Documents, and approvals of applications for permit to drill in the Gulf of Mexico are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction of adverse modification of habitat of such species which is determined by [the Service] . . . to be critical."  *See* 16 U.S.C. § 1536(a)(2); *see also* 50 C.F.R. § 402.14; *False Pass*, 733 F.2d at 609; *Defs. of Wildlife*, 871 F. Supp. 2d at 1328.

119.    Formal consultation "commences with the Federal agency's written request for consultation under section 7(a)(2) of the Act and concludes with [FWS's] issuance of a biological opinion under section 7(b)(3) of the Act."  50 C.F.R. § 402.02; *see also id.* § 402.14(c).

120.    BOEMRE submitted a written request for formal consultation on its Gulf of Mexico oil and gas activities under OCSLA to FWS on July 30, 2010.  The Bureaus submitted a final biological assessment to FWS in early 2013.  Formal consultation between the Bureaus and FWS therefore commenced on July 30, 2010, *see id.* § 402.02, or, in any event, no later than the date on which the Bureaus submitted the biological assessment to FWS in 2013, *see id.* § 402.14(c).

121.    The initiation of formal consultation requires FWS to complete consultation and deliver a biological opinion to the Bureaus upon the consultation's conclusion.  16 U.S.C. § 1536(b)(1)(A), (b)(3)(A); 50 C.F.R. § 402.14(e), (g), (l).

122.    FWS has not issued a biological opinion on the reinitiated consultation.

123.    In addition, on information and belief, the Bureaus have not determined that their proposed actions are not likely to occur and have not determined, with the written concurrence of FWS, that their proposed actions are not likely to adversely affect any listed species or critical habitat.  The formal consultation commenced in 2013 therefore has not concluded.  *See* 50 C.F.R. § 402.14(l).

124.    Under the APA, each federal agency must "conclude a matter presented to it" "within a reasonable time."  5 U.S.C. § 555(b).  The APA authorizes reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed."  *Id.* § 706(1).

125.    The schedule that Congress prescribed in the ESA for completing consultations informs the timeline for defining the APA duty to act within a reasonable time.  *See* 16 U.S.C. § 1536(b)(1)(A).

126.    FWS's multiple-year delay in completing the legally required reinitiated consultation on the Bureaus' OCSLA-related oil and gas activities in the Gulf of Mexico constitutes unreasonable delay under APA section 706(1) and a failure to conclude a matter presented to it within a reasonable amount of time under APA section 555(b).  5 U.S.C. §§ 555(b), 706(1).

127.    FWS's multiple-year delay in publishing a legally required final biological opinion on the Bureaus' OCSLA-related oil and gas activities in the Gulf of Mexico constitutes unreasonable delay under APA section 706(1) and a failure to conclude a matter presented to it within a reasonable amount of time under APA section 555(b).  5 U.S.C. §§ 555(b), 706(1).

128.    FWS's unlawful delay in completing this required consultation and publishing a biological opinion may result in approvals of oil and gas activities in the Gulf of Mexico that have an elevated risk of harming or killing threatened and endangered species.  In light of the importance Congress has assigned to the protection of threatened and endangered species, the delay at issue in this case is manifestly unreasonable.

## Prayer for Relief

WHEREFORE, Plaintiffs pray that this Court:

1.    Declare that the Fisheries Service and FWS are in violation of sections 555(b) and 706(1) of the APA, 5 U.S.C. §§ 555(b), 706(1), by unreasonably delaying the legally required

completion of consultation that the Bureaus initiated over seven years ago on the Bureaus'

OCSLA-related oil and gas activities in the Gulf of Mexico;

2.      Declare that the Fisheries Service and FWS are in violation of sections 555(b) and

706(1) of the APA, 5 U.S.C. §§ 555(b), 706(1), by unreasonably delaying the legally required

publication of a biological opinion on the Bureaus' OCSLA-related oil and gas activities in the

Gulf of Mexico;

3.      Order the Fisheries Service and FWS to complete the required consultation and

publish final biological opinions within 90 days, in accordance with 50 C.F.R. § 402.14(e);

4.      Award Plaintiffs their attorney's fees and costs in this action pursuant to

28 U.S.C. § 2412; and

5.      Grant such other and further relief as the Court deems just and proper.


Respectfully submitted this 21st day of June, 2018.


Tania Galloni
Earthjustice (FL Bar 619221)
4500 Biscayne Blvd., Suite 201
Miami, FL 33137
305-440-5432 Telephone
850-681-0020 Fax
tgalloni@earthjustice.org

Christopher D. Eaton (*Pro Hac Vice* pending)
Earthjustice
705 2nd Ave., Suite 203
Seattle, WA 98104
206-343-7340 Telephone
206-343-1526 Fax
ceaton@earthjustice.org

Andrea A. Treece (*Pro Hac Vice* pending)
Earthjustice
50 California St., Suite 500
San Francisco, CA 94111
415-217-2000 Telephone
415-217-2040 Fax
atreece@earthjustice.org

*Attorneys for Plaintiffs Gulf Restoration*
*Network, Sierra Club, and Center for*
*Biological Diversity*

**Certificate of Service**

I hereby certify that on June 21, 2018, I filed the foregoing with the Clerk of the Court through use of Choice Express Tampa Courier Service, which presented the forgoing documents with the Clerk for certification.

_____

Tania Galloni